**Yusuf Ali ALI, et al., Petitioners,**

v.

**John ASHCROFT, et al., Respondents.**

No. 02–CV–2304.

United States District Court,
W.D. Washington.

Jan. 17, 2003.

Thomas L. Boeder, Perkins Coie, Seattle, WA, for petitioners.

Christopher Lee Pickrell, U.S. Attorney's Office, Seattle, WA, Greg D. Mack, U.S. De-

partment of Justice, Office of Immigration LIT, Washington, DC, for respondents.

## ORDER GRANTING INJUNCTION AND CERTIFYING CLASS

PECHMAN, District Judge.

Petitioners are Somalis with final orders of removal. They seek to certify a nationwide habeas and declaratory class, as well as an order enjoining removal of persons to Somalia and declaring such removal illegal. On December 10, 2002, this Court granted Petitioners' request for a temporary restraining order enjoining the Immigration and Naturalization Service ("INS") from removing Somali natives or nationals in the United States to Somalia. With the agreement of the parties, the Court set the matter for a preliminary injunction hearing on January 14, 2003. The parties also submitted briefs on class certification for concurrent consideration. (Dkt. No. 28.) Having weighed the moving parties' probability of success on the merits and possibility of irreparable injury, the Court GRANTS a preliminary injunction. Because the Court effectively decides the merits of Petitioners' injunctive claim on consideration of the preliminary injunction, both parties request that the Court declare the injunction permanent. Since reaching the issue of a permanent injunction may assist review on appeal, and there is no outstanding legal issue on which the parties wish to be heard, the Court concludes that the injunction is permanent. Finding that Petitioners have met the requirements of Fed.R.Civ.P. 23, the Court GRANTS Petitioners' motion for class certification and certifies the following class: All persons in the United States who are subject to orders of removal, expedited removal, deportation or exclusion to Somalia that are either final or that one or more of Respondents believe to be final, excluding any person with a habeas petition pending, or on appeal, raising the issue of unlawful removal to Somalia under 8 U.S.C. § 1231(b). Respondents are ORDERED not to remove to Somalia any person in the above nationwide class. The Court also ORDERS that Petitioners Ali, Aweys, and Hundiye be released pursuant to the Supreme Court's directive in *Zadvydas v. Davis*, 533 U.S. 678,

121 S.Ct. 2491, 150 L.Ed.2d 653 (2001). The Court notes that Petitioner Mohamud has a similar pending habeas petition before the Honorable Barbara J. Rothstein, and the Court finds that the most prudent course is to allow those proceedings to continue. Finally, the Court DENIES the Government's request for an order staying the injunction pending its decision to appeal. Such an order would render the entire purpose of an injunction meaningless.

## BACKGROUND

The East African nation of Somalia has been without a central government since the ouster of dictator Siad Barre in 1991. Over the last decade, warring factions have controlled fiefdoms in various regions of the country, and a state of general chaos persists. Persecution of certain ethnic groups or clans by others led to an influx of refugees into the United States throughout the 1990s.

Following the attacks of September 11, 2001, the Bush Administration stepped up efforts to remove foreign nationals with final orders of deportation, with an emphasis on those nations with links to terrorism. While the Administration fears that Somalia may provide fertile ground for terrorist groups, as of the beginning of 2002 there appears to be no credible evidence that any organization in Somalia, such as Al–Ittihad, has an international focus or established links to Al–Queda. Resp. Ex. 1, Ted Dagne, *Africa and the War on Terrorism*, CRS Report for Congress, January 17, 2002, at 16. Nevertheless, a series of directives from Attorney General John Ashcroft indicate a policy shift emphasizing removal of persons to suspect countries, including Somalia, as expeditiously as possible. Foster Decl. Exs. J and K.

Since 1997, 196 Somali nationals have been removed to Somalia. 3rd Venturella Decl. Of those, 49 were removed on criminal grounds, and 147 on non-criminal grounds. *Id.* Somalis are typically removed from the United States through the use of charter aircraft. 2nd Venturella Decl. Removal to Somalia typically does not involve INS agents accompanying detainees to the territory of Somalia. *Id.*

The effort to remove Somalis was eventually challenged, and the District of Minnesota was the first to determine that the Attorney General did not have the statutory authority to remove persons to Somalia because there was no functioning government to "accept" them. *See Jama v. INS,* 2002 WL 507046 (D.Minn. March 31, 2002) (Tunheim, J.) That decision is currently on appeal before the Court of Appeals for the Eighth Circuit. The statutory holding was then reiterated by another judge in the same court. *Farah v. INS,* 2002 WL 31866481 (D.Minn. Dec.20, 2002) (Frank, J.). In November and December of 2002, temporary restraining orders were entered in the Eastern and Western Districts of Louisiana, respectively, enjoining the removal of specific persons to Somalia. *Ghelle v. Ashcroft,* E.D. La. Civil Case No. 02–3478 (Nov. 20, 2002); *Mohamed v. Ashcroft,* W.D. La. Civil Case No. 02–2484 (Dec. 3, 2002).

On November 13, 2002, the present action was filed on behalf of five Somali nationals whom the INS planned to deport to Somalia imminently. A temporary restraining order was issued enjoining their removal, and a briefing schedule was set to determine whether a preliminary injunction should issue. In the interim, Petitioners' counsel amended the original petition to address the issue on a classwide basis. This Court issued a classwide temporary restraining order on December 9, 2002, finding a likelihood of success on the merits of Petitioners' claim that the Attorney General lacked the authority to deport persons to Somalia in the absence of a functioning government.

Oral argument on Petitioners' preliminary injunction and class certification motion was held on January 14, 2003. At that hearing, the Court orally granted a preliminary injunction and certified a nationwide class of similarly situated persons ordered removed to Somalia. The Court then called for further briefing on whether the preliminary injunction should be a final order, as well as the timing and jurisdiction over the named petitioner's claim for release under *Zadvydas v. Davis,* 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001).

### The Named Petitioners

#### 1. Yusuf Ali Ali

The INS ordered that Petitioner Yusuf Ali Ali be removed from the United States on July 10, 2001. After Mr. Ali filed a habeas corpus petition for his release on the ground that removal was not likely to occur in the reasonably foreseeable future, the INS released Mr. Ali subject to an order of supervision on November 2, 2001. Petitioner Ali was then re-detained in November of 2002 because the local District Director's office was informed that plans were underway for his imminent removal to Somalia.

#### 2. Mohamed Aweys

The INS ordered that Petitioner Mohamed Aweys be removed from the United States on October 30, 2001. Mr. Aweys was taken into custody by the INS on February 28, 2002. On September 20, 2002, this Court ordered his release on the ground that removal to Somalia was not likely to occur in the reasonably foreseeable future, and he was released subject to an order of supervision. Mr. Aweys was then re-detained in November of 2002, because the local district director's office was informed that plans were underway for his imminent removal to Somalia.

#### 3. Mohamed Hussein Hundiye

The INS ordered that Petitioner Mohamed Hussein Hundiye be removed from the United States on April 26, 2001. After Mr. Hundiye filed a habeas corpus petition for his release on the ground that removal was not likely to occur in the reasonably foreseeable future, the INS released Mr. Hundiye subject to an order of supervision on December 19, 2001. Petitioner Hundiye was then re-detained in November of 2002 because the local district director's office was informed that plans were underway for his imminent removal to Somalia.

#### 4. Gama Kalif Mohamud

The INS ordered that Petitioner Gama Kalif Mohamud be removed from the United States on April 21, 2000. Mr. Mohamud was released from INS custody on January 30,

2001, subject to an order of supervision. That order of supervision was revoked and Mr. Mohamud was re-detained on July 12, 2002. Prior to the attempt to remove Petitioner Mohamud to Somalia, he filed a habeas corpus petition for his release on the ground that removal was not likely to occur in the reasonably foreseeable future. That petition is currently pending before the Honorable Barbara J. Rothstein.

## ANALYSIS

### I. Jurisdiction

#### A. Jurisdiction is Not Barred by 8 U.S.C. § 1252(g)

■ The Government argues that § 1252(g) of the INA, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), forecloses any and all judicial review of the Attorney General's decision to remove Petitioners to Somalia. Section 1252(g) section reads as follows:

(g) Exclusive jurisdiction

Except as provided in this section and notwithstanding any other provision of law, no court shall have jurisdiction to hear any cause or claim on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

8 U.S.C. § 1252(g). The INS first argues that judicial review is precluded in the present case because it arises from the Attorney General's decision to execute a removal order. The INS then argues that this provision blocks all judicial review by District Courts, both on direct review and in habeas proceedings.

The Government's arguments must fail for two reasons. First, the Supreme Court has held that the jurisdiction-stripping effect of § 1252(g) is limited to review of three discreet, discretionary actions that the Attorney General may take: the " 'decision or action' to 'commence proceedings, adjudicate cases, or execute removal orders.' " Reno v. American–Arab Anti–Discrimination Comm., 525

U.S. 471, 482, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999) (emphasis in original).

Petitioners here do not challenge the Attorney General's discretionary decision to attempt to execute their removal. Similarly, they do not challenge the various Immigration Judges' determinations of their "removability." Rather they challenge the legality of removal to Somalia, a country that has no government to accept Petitioners for removal. This is a purely legal question that does involve review of a discretionary decision of the Attorney General. Therefore § 1252(g) stands as no bar to this Court's review of alleged illegal action by the INS.

■ Second, § 1252(g) does not limit judicial review on a petition for a writ of habeas corpus. Two federal courts in Minnesota have now interpreted § 1252(g) under *INS v. St. Cyr*, 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001), and have determined that the section is not applicable in the habeas context. *See Jama v. INS,* 2002 WL 507046 (D.Minn. March 31, 2002) (Tunheim, J.) and *Farah v. INS,* 2002 WL 31866481 (D.Minn. Dec.20, 2002) (Frank, J.) This Court agrees with the reasoning in those cases, and holds that review is not precluded because Congress did not expressly limit judicial consideration on habeas corpus.

The legal questions presented in *St. Cyr* are remarkably similar to those presented here. In that case, petitioner sought review of the government's legal conclusion that the Attorney General did not have the power to grant discretionary relief from removal. *St. Cyr,* 533 U.S. at 298, 121 S.Ct. 2271. Petitioner was not challenging his deportability, nor any unfavorable discretionary decision of the Attorney General—rather the petition presented a "pure question of law." *Id.* at 300, 121 S.Ct. 2271. The INS argued that three provisions of IIRIRA— §§ 1252(a)(1), 1252(a)(2)(C), and 1252(b)(9) of the INA— had eliminated habeas review as provided by the general habeas statute, 28 U.S.C. § 2241. *Id.* at 298, 121 S.Ct. 2271. The Supreme Court found that there was no "clear, unambiguous, and express statement of congressional intent to preclude judicial consideration on habeas," and therefore held that

habeas jurisdiction had not been repealed by those sections of IIRIRA. *Id.* at 314, 121 S.Ct. 2271.

Similarly, Petitioners in this case do not challenge their removability, nor do they challenge the Attorney General's discretionary decision to execute their removal. Rather, they challenge the legal conclusion that they can be removed to Somalia as a matter of statutory interpretation.

The INS argues that 1252(g) limits a court's "jurisdiction *to hear*" (emphasis added) claims arising out of decisions to execute removal orders, and that this language provides a broader jurisdictional bar than the sections interpreted in *St.Cyr.* Return at 14. Yet the same prudential concerns of statutory interpretation that existed in *St. Cyr* are present in the instant case. Absent a clear, unambiguous, and express statement of congressional intent, this Court refuses to find that 1252(g) strips this Court of habeas jurisdiction. *St. Cyr,* 533 U.S. at 314, 121 S.Ct. 2271. The Court also notes that serious constitutional problems involving the Suspension Clause would arise from an interpretation of § 1252(g) that substantially limits habeas review. U.S. Const. art. I, § 9, cl. 2; *St.Cyr,* 533 U.S. at 300, 304, 121 S.Ct. 2271.

Because the present petition does not challenge a discretionary decision of the Attorney General to execute a removal order, and because § 1252(g) does not expressly revoke habeas jurisdiction, this Court finds that it has jurisdiction to hear this motion for preliminary injunction.

## B. *Petitioners Need Not Exhaust Administrative Remedies*

■ Respondents contend that Petitioners should have raised and litigated the absence of an accepting government in their administrative proceedings, and that failure to do so waives their current claim. When a statute requires exhaustion, a petitioner's failure to do so deprives the court of jurisdiction. *El Rescate Legal Servs., Inc. v. Executive Office of Immigration Review,* 959 F.2d 742, 746 (9th Cir.1991). However, courts recognize exceptions to the exhaustion requirement: (1) in cases of class allegations of a pattern or practice of violations of statutory

or constitutional rights; and (2) when pursuing administrative remedies would be futile. *Id.* at 746–47.

Where no statute mandates exhaustion, courts have applied a prudential exhaustion requirement when: (1) agency expertise is needed to generate a proper record; (2) relaxation of the requirement would encourage the deliberate bypass of an administrative scheme; and (3) administrative review is likely to allow the agency to correct its own mistakes and to preclude the need for judicial review. *Id.* at 747.

Petitioners are not required to have anticipated and challenged that the government would remove them in violation of the law. The general statute requiring exhaustion of administrative remedies on review of removal orders, 8 U.S.C. § 1252(d)(1), does not apply in this matter. While Petitioners would have to exhaust administrative remedies if they were asking the court to review their final removal orders, here Petitioners do not contest that they have been lawfully ordered removed. Instead, Petitioners challenge the Attorney General's authority to remove them to a country without a government capable of manifesting acceptance. Respondents do not direct the Court to any other statute that requires exhaustion.

■ There are no grounds to apply a prudential exhaustion requirement in this matter. Since Petitioners raise a purely legal question of statutory interpretation, there is no need for INS to develop a factual record. The issue of the Attorney General's authority to remove a person to a non-accepting country is an issue that arises after a final order of removal has been entered, and therefore there is no administrative scheme to bypass. As Somali nationals, Petitioners appropriately designated Somalia as the country to which they would be removed if deported from the United States. 8 U.S.C. § 1231(b)(2)(A). The regulations contemplate the situation here that a person might appropriately designate a country that will not accept him or her:

> The immigration judge shall notify the alien that if he or she is finally ordered removed, the country of removal will in the

first instance be directed pursuant to section 241(b) [8 U.S.C. § 1231(b)] of the Act to the country designated by the alien, unless section 241(b)(2)(C) of the Act applies, and shall afford him or her an opportunity then and there to make such designation. The immigration judge shall then specify and state for the record the country, or countries in the alternative, to which the alien's removal will be directed pursuant to section 241(b) of the Act *if the country of his or her designation will not accept him or her into its territory* ... 8 C.F.R. § 1240.10 (emphasis added). Although parties have litigated before the BIA the question of whether the government appropriately disregarded a designation and lawfully chose another country, *Matter of Niesel,* 10 I & N Dec. 57, 59, 1962 WL 12904 (1962), Petitioners are not required to anticipate that the government would violate statutory provisions and attempt to remove them to a non-accepting country.

■ Even if there were a statutory exhaustion requirement, Petitioners' claims fall into the two exceptions to the exhaustion requirement noted above. First, requiring exhaustion would be particularly inappropriate since Petitioners allege violations of the statutory rights of a class. *El Rescate Legal Servs.,* 959 F.2d at 746–47. Second, consideration of Petitioners' claims by the agency would be futile since INS' position is already set. *Id.* at 746. Petitioners were not required to raise the non-accepting government issue in their administrative proceedings.

## II. Preliminary Injunction

■ Although the parties now agree that the injunction issued by the Court should be made permanent, the original posture of the motion as briefed and argued was that of a preliminary injunction. Therefore, the Court begins its analysis under standards for a preliminary injunction. For a preliminary injunction to issue, Petitioners must meet their burden by demonstrating either: (1) a combination of probable success on the merits and the possibility of irreparable injury; or (2) that serious questions are raised and the balance of hardships tips sharply in its favor. *Textile Unlimited, Inc. v. A..BMH*

*Co., Inc.,* 240 F.3d 781, 786 (9th Cir.2001); *Mayo v. United States Gov. Printing Off.,* 839 F.Supp. 697, 699 (N.D.Cal.1992), *aff'd,* 9 F.3d 1450 (9th Cir.1993). These two formulations are not separate tests but represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases. *United States v. Odessa Union Warehouse Co-op,* 833 F.2d 172, 174 (9th Cir.1987).

## A. Harm

■ The possibility of irreparable injury to the plaintiffs is extremely high. The Government's position appears to be that because no one who is removed to Somalia returns to the United States, acceptance has occurred. Yet nothing in the record attests to any first hand knowledge of prior transport success or failure to repatriate Somalis to the geographical territory of Somalia. The INS is likewise unable to inform the Court what happens to Somalis who are removed, or even to confirm that the Somalis handed over to the charter aviation company are in fact transported to Somalia.

Petitioners state that they fear that they will be persecuted or even killed upon their arrival in Somalia. First Amended Pet. at 3. While Petitioners' fears of persecution and torture may not be relevant to seeking asylum at this stage of their proceedings, they are certainly relevant to a finding of irreparable harm. Nothing has made this point more clearly than the Government's own submissions to this Court. The INS has shown that Somalia is a country in chaos, engaged in clan warfare with rival groups clashing over turf and control, with no government and no diplomatic relations with the United States. There is no official entity that might provide even the most basic of administrative protections upon their arrival. The Court finds that there is a substantial possibility of irreparable harm to Petitioners based on present conditions in Somalia, specifically the lack of any functioning government. In addition, serious questions are raised in this case by the proposition that the INS may be able to remove a person to a country that has no government to accept them and no government to protect them. This action appears

to be wholly outside the statutory authority of the INS.

■ For these reasons, the balance of the hardships tips sharply in favor of Petitioners. Petitioners stand to face persecution or even death if the status quo is not maintained. The Government, on the other hand, stands to face little or no hardship that is not self-induced. Expenses related to current detention of the petitioners is a result of INS or DOJ decisions to detain. All but one of the individual Petitioners were on release subject to conditions, at little or no expense to the government, prior to the most recent efforts to remove them. Although the Government asserts that great hardship may befall it when the tool of removal of Somalis is taken from the arsenal of the war on terrorism, Respondents have failed to explain how removing Petitioners relates to terrorism and have presented no evidence of international terrorist activities in Somalia. Therefore, weighing the potential hardships to each of the parties, the Court finds that the balance shifts sharply in favor of Petitioners.

## B. Merits

■ The probability of success on the merits in this case is extremely high. There is a substantial likelihood that Petitioners will show that the INS does not have the statutory authority to remove persons to Somalia.

### 1. Statutory Construction of 1231(b)

The heart of this case focuses on the INS' asserted authority to remove persons to Somalia in the absence of any recognized government to "accept" them. The Government argues that because there is no government to *reject* persons removed to the territory of Somalia, "acceptance" has occurred. Put another way, Petitioners would be deemed "accepted" unless they are "barred from deplaning in Somalia or otherwise expelled from Somalia." Return at 24. Yet every source of law before the Court supports Petitioners' interpretation, namely that the statute requires acceptance by a government of the receiving country. If there is no government, the Attorney General has no authority to effect the removal.

Section 1231(b) of the INA sets forth what can be viewed as "a three step process to determine the country to which a removable alien should be sent after a final order of removal has been issued against him." Return at 17; *see also Farah*, 2002 WL 31866481 at *3. Specifically, § 1231(b) provides:

(2) Other aliens

Subject to paragraph (3)—

(A) Selection of country by alien

Except as otherwise provided in this paragraph–

(i) any alien not described in paragraph (1) who has been ordered removed may designate one country to which the alien wants to be removed, and

(ii) the Attorney General shall remove the alien to the country the alien so designates.

 * * * * * *

(C) Disregarding designation

The Attorney General may disregard a designation under subparagraph (A)(i) if–

(i) the alien fails to designate a country promptly;

(ii) the government of the country does not inform the Attorney General finally, within 30 days after the date the Attorney General first inquires, whether the government will accept the alien into the country;

(iii) the government of the country is not willing to accept the alien into the country; or

(iv) the Attorney General decides that removing the alien to the country is prejudicial to the United States.

(D) Alternative country

If an alien is not removed to a country designated under subparagraph (A)(i), the Attorney General shall remove the alien to a country of which the alien is a subject, national, or citizen unless the government of the country–

(i) does not inform the Attorney General or the alien finally, within 30 days after the date the Attorney General first inquires or within another period of time the Attorney General decides is reasonable, whether the government will accept the alien into the country; or

(ii) is not willing to accept the alien into the country.

(E) Additional removal countries

If an alien is not removed to a country under the previous subparagraphs of this paragraph, the Attorney General shall remove the alien to any of the following countries:

(i) The country from which the alien was admitted to the United States;

(ii) The country in which is located the foreign port from which the alien left for the United States or for a foreign territory contiguous to the United States;

(iii) A country in which the alien resided before the alien entered the country from which the alien entered the United States;

(iv) *The country in which the alien was born;*

(v) The country that had sovereignty over the alien's birthplace when the alien was born;

(vi) The country in which the alien's birthplace is located when the alien is ordered removed.

(vii) If impracticable, inadvisable, or impossible to remove the alien to each country described in a previous clause of this subparagraph, another country whose government will accept the alien into that country.

8 U.S.C. § 1231(b) (emphasis added).

Thus, in step one of the procedure, a person subject to a removal order may designate a country to which he or she wants to be removed. *Id.* at § 1231(b)(2)(A). That choice shall be respected unless one of the conditions in § 1231(b)(2)(C) arises, such as if the government of the country designated is not willing to accept that person. In that case, the Attorney General may proceed to step 2 of the process, by which the person may be removed to an "alternative" country where he or she is a "subject, national, or citizen," provided (once again) that the country's government is willing to accept the person. *Id.* at § 1231(b)(2)(D). If that alternative country is not willing to accept the person, step three applies. In that vein, § 1231(b)(2)(E) provides "additional" removal countries to which a person may be removed if the first two steps are not successful in affecting removal. The parties agree that this step-wise process is the correct procedure, and that step 3 governs their proposed removal.

### 2. Plain Language of the Statute

The INS argues that the "plain language" of the statute demonstrates that the INS may remove a person without acceptance by a government to a country in which he was born. Yet every source of law and every common legal analysis indicate that there must be acceptance of a government for every removal.

First, the structure and effect of the statute as a whole indicate that the various subparts of subsection (E) must be read as requiring acceptance by the other country's government. This interpretation arises from the well-established canon of statutory interpretation that courts "must avoid a construction that fails to give effect to every subsection of the enactment." *Security Pacific Nat. Bank v. Resolution Trust Corp.*, 63 F.3d 900, 905 (9th Cir.1995). Here, to read subparts (i) through (vi) as not requiring acceptance by a foreign government would render subsections (C) and (D) superfluous. Such an interpretation would also lead to absurd results. Under the INS' interpretation, in a situation where a government has actually denied acceptance of a removable person, a person could be airdropped surreptitiously into that same country if it met the requirements of one of the subparts, and the INS would consider this "acceptance" so long as the person was not barred from "deplaning" or landing or was otherwise expelled from that country. This cannot be a correct reading of the law. The only logical interpretation of the plain meaning that gives effect to all sections of the statute is one that requires

government acceptance from "additional" countries listed in § 1231(b)(2)(E)(i-vi).

Second, the plain language of the statute indicates that the option to remove a person to the country in which he or she was born only exists where that country is different from the countries in steps 1 and 2. Step 3 involves "additional removal countries." Additional countries means countries *other than* the one designated by the removable person (step 1) or a country of which he is a subject, national or citizen, (step 2). Thus, the plain language of the statute demonstrates Congress' intent that a person be removed to a country of his birth only if different from that designated in step one. In the present case, Petitioners have either designated Somalia as their country of removal, or are subjects, nationals, or citizens thereof. Subsections (C) and (D) require the government of those countries to "accept" them prior to removal. The INS should not be allowed to thwart this requirement by skipping to step 3.

Third, this interpretation is consistent with relevant case law interpreting § 1253(a), the statutory predecessor of § 1231(b)(2). *See United States ex rel. Tom Man v. Murff*, 264 F.2d 926 (2d Cir.1959). In *Tom Man*, the court interpreted the substantively identical language of step three of § 1253(a) to require that a country be willing to accept the person into its territory. *Id.* at 928. *See also Amanullah and Wahidullah v. Cobb*, 862 F.2d 362 (1st Cir.1988) (requiring written verification of a country's willingness to accept the alien before removal under a prior section of the act).

The INS argues that the changes made to the statute in 1996 upon its re-enactment as § 1231(b)(2) renders the above authority unpersuasive. Return at 23, 25–26. At the same time, the INS would have this Court defer to an allegedly contrary interpretation of the statute by the Board of Immigration Appeals. *See Matter of Niesel*, 10 I & N Dec. 57 (BIA 1962). The INS cannot have it both ways. A review of the text of the statute prior to and since the amendments shows that the two versions are substantively indistinguishable.

Moreover, *Matter of Niesel* does not support the proposition that the Attorney General may remove a person to a country without an accepting government. First, *Matter of Niesel* simply held that the government appropriately disregarded a petitioner's designation and lawfully chose another country without *first inquiring* whether that country would accept the petitioner. *Id.* at 59. Thus, *Matter of Niesel* addressed only the issue of an *initial* inquiry, not final acceptance of the country to which a person would be returned. *Id.* ("When designating a country in step three as a place of deportation, there is no requirement that *preliminary* inquiry be addressed to the country to which deportation is ordered") (emphasis added). Second, the BIA's later decision in *Matter of Linnas* clearly holds that "the 'government' of a country selected under any of the three steps must indicate it is willing to accept a deported alien into its 'territory.'" 19 I. & N. Dec. 302, 307, 1985 WL 56051 (BIA 1985). Respondents argue that Matter of Linnas, since it arose in the Second Circuit, was required to follow *Tom Man*, creating a split of authority with *Matter of Niesel*. However, *Matter of Linnas* does not simply follow the *Tom Man* case, but also cites the predecessor statute at issue here, former 8 U.S.C. § 1253, as authority for the proposition that there must be an accepting government. *Id.* There is no split of authority. The BIA recognizes the acceptance requirement. Therefore, all relevant case law supports the premise that government acceptance is required in order to affect removal to one of the "additional" countries listed in subsection E.

*3. Legislative History*

The legislative history of the disputed statutory provision unequivocally supports Petitioners' reading that the Attorney General must receive permission from a country in order to remove a person to that country. The statutory provision at issue, 8 U.S.C. § 1231(b), was originally enacted in 1952 as 8 U.S.C. § 1253(a) as part of the McCarran/Walter Act which created the modern Immigration and Nationality Act. Oscar M. Trelles and James F. Bailey, 1 *Immigration and Nationality Acts, Legislative Histories*

*and Related Documents* (1979). A number of references in a Senate study of immigration laws clarifies that the government may deport persons only with the receiving government's acceptance:

> In order to execute a warrant of deportation, a passport or travel document must be obtained from the representative of the foreign country to which the alien is to be deported. This leads to many complications which are discussed below. If deportation is not effected within a reasonable time, the alien must be released.

*The Immigration and Naturalization Systems of the United States,* Report of the Committee on the Judiciary of the Senate 629 (1950). Even in light of Cold War national security issues, the government recognized that it could not deport persons absent acceptance:

> One of the most serious problems with which the Immigration and Naturalization Service is faced is the disposition of aliens found deportable by the Service but who cannot be deported. The latest statistics show that there are 3,600 nonenforceable deportation orders, of which 1,365 involve Russians. The nature of the problem was described by Immigration and Naturalization Service in its 1948 report: "Following an order of deportation a passport or other travel document must be procured for the alien in order for him to enter the country to which he is to be deported.... If [the INS or State Department] is unsuccessful in such requests [for travel documents], the alien cannot be deported." It may be readily seen that this is an alarming situation. As one writer stated in a recent article, if Russia or any other country landed a planeload of aliens in the United States, such country would have every assurance that the aliens could roam the country at will in a very few months. All the country has to do is refuse to issue passports and the aliens cannot be deported.

*Id.* at 637–38. In considering how to address this problem, the options considered included detention, orders of supervision, and "authorizing the Attorney General, within his discretion, to deport an alien to any country which would accept him into its territory." *Id.* at 638. Thus, the legislative history indicates that Congress, in adding "additional countries of removal" in § 1231(b) and its predecessor, was attempting to provide the executive branch options in case acceptance was not obtained from a person's designated country. Nowhere is it envisioned that Congress established a system that eliminated the need for acceptance from the receiving country.

### 4. No Deference to INS' Proposed Construction

 The Government's proposed construction of the law is not entitled to deference. When Congress' intent is clear, the Court must give effect to the unambiguously expressed intent, regardless of the agency interpretation. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Even if the statute were considered ambiguous, there is no regulation to which the Court could defer that purports to allow Petitioners' removal to a country without a government capable of manifesting acceptance. The INS' litigation position is not entitled to deference. *United States v. Trident Seafoods Corp.,* 60 F.3d 556, 559 (9th Cir.1995). Moreover, the agency's own operating instructions and regulations support Petitioners' construction. INS Operating Instruction 243.1(c)(1) states that "deportation cannot be effected until travel documentation has been obtained." Regulations governing detention, removal, and release assume that the government of a country must accept removal. *See, e.g.,* 8 C.F.R. § 241.4(k)(1)(i) (the INS "shall conduct a custody review for an alien ... where the alien's removal, while proper, cannot be accomplished during the period because no country currently will accept the alien.").

### 5. Statutory Construction and International Law

Petitioners contend that returning them to Somalia without the prior acceptance of a functioning government subjects individuals to persecution, arbitrary deprivation of life, and torture or other cruel, inhuman or degrading treatment or punishment. Fitz-

patrick Decl. ¶¶ 12–14, 17–18. Exposing persons to such human rights abuses, Petitioners contend, violates customary international law and provisions of three multilateral treaties to which the United States is a signatory: (1) Article 33(1) of the United Nations Convention Relating to the Status of Refugees, 189 U.N.T.S. 137, as incorporated by Protocol Relating to the Status of Refugees, 606 U.N.T.S. 267, 19 U.S.T. 6223; (2) Articles 6 and 7 of the International Covenant on Civil and Political Rights, 999 U.N.T.S. 171; and (3) Article 3 of the International Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, 1465 U.N.T.S. 85. Respondents do not dispute that Somalia is a war-torn country, with widespread human rights violations, where perpetrators enjoy complete impunity for their actions. *See* Fitzpatrick Decl. ¶ 13. Neither do Respondents dispute that returning members of the putative class to Somalia will result in human rights abuses in violation of international law. Rather, Respondents contend that Petitioners have no private right of action under these treaties.

 Courts generally construe Congressional legislation to avoid violating international law, in accordance with the rule of statutory interpretation announced in *Murray v. The Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 2 L.Ed. 208 (1804). *See Kim Ho Ma v. Ashcroft*, 257 F.3d 1095, 1114 (9th Cir.2001). While Petitioners may not directly invoke rights under non-self-executing treaties, or challenge statutes when Congress has clearly abrogated international law, they certainly may argue that the Court should adopt the statutory interpretation that is consistent with international law. *Kim Ho Ma*, 257 F.3d at 1114. Because Respondents' proposed interpretation of the statute may result in persecution or deprivation of life in violation of international law, Petitioners' proposed construction is preferred as it reconciles the statute with the law of nations.

In summary, Petitioner's reading of the statute is supported by the structure of the statute, the relevant case law, the legislative history of the precursor statute, international law, and is the only interpretation that would give effect to all sections of the statute.

Because Petitioners have made a strong showing of potential for irreparable harm, a substantial likelihood of success on the merits of their statutory claim, and because the balance of the hardships tips sharply in Petitioners' favor, the Court finds that a preliminary injunction should issue.

### C. Permanent Injunction

 Because the Court reaches the merits of Petitioners' statutory argument, both parties request that the Court declare the injunction to be permanent. The requirements for a permanent injunction mirror those of a preliminary injunction. "The traditional bases for injunctive relief are irreparable injury and inadequacy of legal remedies." *Idaho Watersheds Project v. Hahn*, 307 F.3d 815, 833 (9th Cir.2002) *citing Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). "In issuing an injunction, the court must balance the equities between the parties and give due regard to the public interest." *Id.* As stated above, the Court found that Petitioners demonstrated potential for irreparable injury and that the balance of hardships tipped sharply in their favor. These findings are directly applicable to the permanent injunction standard. There being no outstanding issue of law on which the parties wish to be heard, the Court concludes that the Petitioners have demonstrated that the injunction prohibiting the government from removing persons to Somalia should be permanent.

### III. Class Certification

### A. Class Action Jurisdiction

 The INS argues that § 1252(f)(1) of the INA prohibits this Court from enjoining INS action on a classwide basis. That section states:

*(f) Limit On Injunctive Relief–*

(1) In general—Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme

Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provision of part IV of this subchapter [which comprises 8 U.S.C. §§ 1221–1231], as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 [IIRIRA], other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

8 U.S.C. § 1252(f)(1).

Petitioners argue, however, that they do not seek to enjoin the "operation" of § 1231(b), but rather seek to enjoin *violations* of that statute. In other words, because Petitioners allege that the INS is violating its own statute, classwide injunctive relief is not prohibited by § 1252(f)(1). This argument has been accepted by at least two other courts. *Grimaldo v. Reno*, 187 F.R.D. 643, 648 (D.Colo.1999) (holding that class action alleging constitutional violations by the INS in the administration of § 1226 was not barred by § 1252(f)(1)); *Tefel v. Reno*, 972 F.Supp. 608, 618 (S.D.Fla.1997) (allowing putative class action seeking proper implementation of the INA), *vacated on other grounds*, 180 F.3d 1286 (11th Cir.1999). This Court agrees with the rationale in those cases. Petitioners do not seek to enjoin the legal operation of § 1231(b); instead, they seek to enjoin violations of the statute and to ensure that the provision is properly implemented. Because Petitioners have shown a substantial likelihood of success on the merits of their claim that the INS is acting in violation of § 1231(b), a class action is appropriate here.

*B. "Next Friend" Standing*

■ Respondents argue that the individual Petitioners must demonstrate "next friend" standing to litigate on behalf of the putative class. A writ of habeas corpus must be "signed and verified by the person for whose relief it is intended *or by someone acting in his behalf.*" 8 U.S.C. § 2242 (emphasis added). Courts have recognized two methods by which persons may file petitions on behalf of another: "next friend" petitions and class actions. A non-party to a suit may act as a "next friend" on behalf of a person in custody. *Whitmore v. Arkansas*, 495 U.S.

149, 163, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990). "Next friends" must show: (1) the person seeking relief is unable to litigate his or her own cause due to mental incapacity, lack of access to court, or some other disability; and (2) that the next friend has some significant relationship with, and is truly dedicated to the best interests of, the person seeking relief. *Coalition of Clergy, Lawyers, and Professors v. Bush*, 310 F.3d 1153, 1159–60 (9th Cir.2002). Courts have also recognized habeas class actions, where parties to the suit act on behalf of others similarly situated. *See United States Parole Commission v. Geraghty*, 445 U.S. 388, 392, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980); *Mead v. Parker*, 464 F.2d 1108, 1112 (9th Cir.1972).

■ Respondents contend that the individual Petitioners may not litigate on behalf of the putative class members because they do not have next friend standing. This argument is unpersuasive. Next friend status is a question of standing raised under the Article III case or controversy requirement when non-parties attempt to litigate in habeas on behalf on another. *Whitmore*, 495 U.S. at 164, 110 S.Ct. 1717. Here there is no question that Petitioners meet standing requirements because they are parties to the suit. Accordingly, courts that recognize habeas classes do not investigate next friend standing. *See, e.g., Nguyen Da Yen v. Kissinger*, 528 F.2d 1194, 1203 (9th Cir.1975); *United States ex rel. Sero v. Preiser*, 506 F.2d 1115, 1126 (2d Cir.1974), *cert. denied*, 421 U.S. 921, 95 S.Ct. 1587, 43 L.Ed.2d 789 (1975). This Court is unaware of any habeas class action where the issue of next friend standing arises, and Respondents point to none. The requirements of Fed.R.Civ.P. 23, not the doctrine of next friend standing, sufficiently address whether the individual Petitioners and their attorneys are appropriate class representatives. In fact, through their argument for class certification under Rule 23, Petitioners make a strong showing of next friend standing. It appears from the record that the putative class members may not have access to the court due to frequent transfer and lack of access to counsel. In meeting Rule 23 requirements, Petitioners have also demonstrated that they have some

significant relationship with, and are truly dedicated to, the best interests of the putative class members.

## C. Personal Jurisdiction

■ The Government contends that Petitioners do not have personal jurisdiction over the proper respondents for a habeas action because the Court cannot reach the INS District Director of each region where the putative class members are held. Petitioners argue that the Attorney General and the Acting Commissioner of the INS are the appropriate respondents in this action.

■ Courts may grant a writ of habeas corpus "within their respective jurisdictions." 28 U.S.C. § 2241(a). The writ is directed to "the person having custody of the person detained." Fed.R.Civ.P. 81(a)(2). If the Court determines that some appropriate custodian of the petitioner resides within the state, the Court has personal jurisdiction over the petitioner regardless of where he or she is actually detained. *Braden v. 30th Judicial Circuit Court,* 410 U.S. 484, 494–95, 93 S.Ct. 1123, 35 L.Ed.2d 443 (1973). Generally, courts construe the term "custodian" to mean "the person having day-to-day control over the prisoner," because this person is individual who can "produce ... the body of the person detained." *Brittingham v. United States,* 982 F.2d 378, 379 (9th Cir.1992); 28 U.S.C. § 2243.

■ Although the warden of the place of detention is usually the custodian for purposes of habeas, the law is unsettled on who the proper custodian is in immigration habeas petitions. *Vasquez v. Reno,* 233 F.3d 688, 691–92 (1st Cir.2000); *Santiago v. INS,* 134 F.Supp.2d 1102, 1103 (N.D.Cal.2001) ("The proper respondent in a habeas case brought by an alien in INS custody has not been addressed by the Ninth Circuit.") Nonetheless, case law and attorney practice suggests that the INS District Director where the petitioner is held is generally the custodian, although the Attorney General or INS Commissioner may be custodians in extraordinary circumstances. *Henderson v. INS,* 157 F.3d 106, 122–23 (2d Cir.1998); *Santiago,* 134 F.Supp.2d at 1103; *but see Yi v. Maugans,* 24 F.3d 500, 507 (3d Cir.1994) (warden, not District Director, is custodian, because otherwise "the Attorney General of the United States could be considered the custodian of every alien ... because she controls the district directors.").

■ The rules of habeas corpus are not so inflexible as to negate considerations of practicality and necessity, understandably so considering the important issues of liberty at stake. Accordingly, it may be appropriate to treat higher-level officials such as the Attorney General and INS Commissioner as the custodian when: (1) a higher-level official was personally involved in the detention decision, *Padilla v. Rumsfeld,* 233 F.Supp.2d 564, 582–83 (S.D.N.Y.2002); (2) Petitioners are held in an undisclosed location or otherwise unidentified, *Nguyen Da Yen v. Kissinger,* 70 F.R.D. 656, 661 (N.D.Cal.1976); *Demjanjuk v. Meese,* 784 F.2d 1114, 1116 (D.C.Cir.1986); or (3) Petitioners have been transferred between districts or from one site to another, *Mojica v. Reno,* 970 F.Supp. 130, 166–67 (E.D.N.Y.1997).

The Attorney General and INS Commissioner, over whom this Court has personal jurisdiction, are appropriate respondents in this case. As a class action challenging the Attorney General's statutory authority to remove a large number of unidentified Somalis around the country, this is an exceptional case. It is undisputed that Petitioners are transferred from district to district, sometimes even when there are pending habeas petitions. The exact location and identity of Petitioners is unknown. Until the day before this hearing, when the Government disclosed the basic information of the number of Somalis currently detained in each city, the Government has refused to disclose even the place of detention of the putative class members. Finally, there is evidence that the roundup and removal of Somalis is directed not at the district level, but higher in the governmental bureaucracy. Venturella Dep. at 9–11, 20–21, 29–30. Therefore, it is appropriate for Petitioners to name the Attorney General and INS Commissioner as Respondent in this matter.

### D. A Nationwide Class is Appropriate

 Nationwide class actions are not favored because they may impinge on the authority of other courts and unnecessarily strain the docket where the class action originates. *Califano v. Yamasaki*, 442 U.S. 682, 702, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979). Accordingly, a court should take "care to ensure that nationwide relief is indeed appropriate in the case before it, and that certification of such a class would not improperly interfere with the litigation of similar issues in other judicial districts." *Id.* In fact, "[c]lass relief is particularly appropriate when the issues involved are common to the class as a whole and when they turn on questions of law applicable in the same manner to each member of the class." *Gen. Tel. Co. of the S.W. v. Falcon*, 457 U.S. 147, 154, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) (internal quotation marks omitted).

After careful deliberation, the Court finds that a nationwide class is particularly appropriate in the instant case. First, the INS is uniformly applying the statutory interpretation at issue to all class members. Thus, rather than straining multiple court dockets with a flood of identical habeas petitions, it is judicially economical to hear the case in one court. Second, a nationwide class addresses the problem of interstate transportation of individuals subject to final orders of removal and the corresponding difficulty in obtaining counsel. Additionally, the Court notes that the redefinition of the class excluding pending cases in other jurisdictions obviates concerns about impinging on other courts. Therefore, it is appropriate that the class action is nationwide in scope.

### E. Preliminary Considerations Are Met

Before determining whether a petitioner has met the prerequisites of Rule 23(a), the Court must ascertain whether a defined class exists and whether the named class representatives are members of the class. *Bower v. Bunker Hill Co.*, 114 F.R.D. 587, 591–92 (E.D.Wash.1986). The Petitioners' class, as redefined by the Court, includes:

> "[a]ll persons in the United States who are subject to orders of removal, expedited removal, deportation or exclusion to Somalia that are either final or that one or more Respondents believe to be final, excluding any person with a habeas petition pending, or on appeal, raising the issue of unlawful removal to Somalia under 8 U.S.C. § 1231(b)."

In the instant action, it is clear that a defined class exists of more than 2,700 individuals who are subject to final orders of removal. *See* 2nd Venturella Decl. at ¶ 4. Further, Respondents concede that the named Petitioners are subject to final orders of removal, and thus members of the class. *See* Respondents' Return at 7–12. The Court finds that the preliminary considerations are met.

### F. Petitioners have fulfilled Rule 23(a) Prerequisites

Federal Rule of Civil Procedure 23(a) provides in part that:

> One or more members of a class may sue ... as representative parties on behalf of all only if (1) the class is so numerous that joinder of all parties is impracticable, (2) there are questions of law or fact common to the class, (3) the claims ... of the representative parties are typical of the claims ... of the class, (4) the representative parties will fairly and adequately protect the interests of the class.

Petitioners have met all prerequisites.

#### 1. Numerosity

 In order to meet the first element of 23(a), Petitioners must show that the class is so numerous that joinder is impractical. "[I]mpracticability does not mean impossibility, but only the difficulty or inconvenience of joining all members of the class." *Harris v. Palm Springs Alpine Est., Inc.*, 329 F.2d 909, 913–14 (9th Cir.1964), *citing, Advert. Specialty Nat. Assn. v. FTC*, 238 F.2d 108, 119 (1st Cir.1956). Further, the Court does not need to know the exact size of the putative class, "so long as general knowledge and common sense indicate that it is large." *Perez–Funez v. INS*, 611 F.Supp. 990, 995 (C.D.Cal.1984). Finally, " 'where the class includes unnamed, unknown future members, joinder of such unknown individuals is impracticable and the numerosity requirement is therefore met,' regardless of

class size." *Natl. Assn. of Radiation Survivors v. Walters,* 111 F.R.D. 595, 599 (N.D.Cal. 1986), *citing, Intl. Molders' and Allied Workers' Local Union No. 164 v. Nelson,* 102 F.R.D. 457, 461 (N.D.Cal.1983).

The Court finds that numerosity is clearly met. At least 2,700 unnamed Somalis dispersed throughout unknown judicial districts are subject to final orders of removal. For the purposes of a habeas petition, as long as an individual is subject to a final order of deportation, the individual "is deemed to be 'in custody' for the purposes of the INA, and therefore may petition a district court for habeas review of that deportation order." *Nakaranurack v. United States,* 68 F.3d 290, 293 (9th Cir.1995). *See also Miranda v. Reno,* 238 F.3d 1156, 1158–59 (9th Cir.2001), *cert. denied,* 534 U.S. 1018, 122 S.Ct. 541, 151 L.Ed.2d 419 (2001); *Williams v. INS,* 795 F.2d 738, n. 3 (9th Cir.1986) (Ninth Circuit has incorporated the broad construction of the term "in custody" found in the penal context into immigration law). Therefore, given the large number of individuals, the vast number of whom are unknown, joinder is more than impracticable, it's impossible. Numerosity is met.

### 2. Commonality

Rule 23(a) requires "that there are questions of law or fact common to the class." Even if there are factual differences between class members, as long as " 'issues ... common to the class as a whole' [ ] exist and 'turn on questions of law applicable in the same manner to each member of the class,' " commonality is established. *Von Colln v. County of Ventura,* 189 F.R.D. 583, 590 (C.D.Cal.1999), *citing, Califano,* 442 U.S. at 700–01, 99 S.Ct. 2545. *See also Forbush v. J.C. Penney Co., Inc.,* 994 F.2d 1101, 1106 (5th Cir.1993) ("the interests ... of the various plaintiffs need not be identical ... the commonality test is met when there is at least one issue whose resolution will affect all or a significant number of the putative class members.") (internal quotation marks omitted).

Respondents argue that because the class members received their final orders of removal pursuant to a variety of immigration statutes, the factual circumstances underlying the claim differ too much to establish commonality. However, why or how Petitioners received their final orders of removal is irrelevant, as Petitioners are not contesting the removal orders. Rather, Petitioners contest INS' statutory interpretation regarding whether or not it can remove individuals to a country lacking a government with the ability to officially accept deportees. The question at the center of the case is a discrete statutory issue identical to all members of the class; the validity of the orders of the removal are outside the scope of the issue. Commonality is met.

### 3. Typicality

To establish typicality, "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Gen. Tel. Co. of the S.W.,* 457 U.S. at 154, 102 S.Ct. 2364. Typicality is required in order to ensure that the named Petitioners' experiences do not markedly diverge from those of class members. *Von Colln,* 189 F.R.D. at 591. However, much like commonality, even if class members are not identically situated, typicality is not defeated if there are legal questions common to all class members. *Harris,* 329 F.2d at 914. *See also, Smith v. U. of Wash. Law Sch.,* 2 F.Supp.2d 1324, 1342 (W.D.Wash.1998) ("When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented ... typicality ... is usually satisfied, irrespective of varying fact patterns which underlie individual claims."). Additionally, commonality and typicality often merge. *Gen. Tel. Co. of the S.W.,* 457 U.S. at n. 3, 102 S.Ct. 2364.

Respondents' typicality arguments mirror their commonality position. Respondents claim that the named Petitioners do not have standing to bring claims on behalf of unnamed members because class members received final removal orders pursuant to a variety of immigration statutes. However, given that Petitioners do not dispute their final removal orders, it is irrelevant how the removal orders were obtained. All claims

are united by a single, discrete legal question. Typicality is met.

### 4. Adequacy of Representation

 The final prerequisite, adequacy of representation, entails a two pronged analysis. "First, the named representatives must appear able to prosecute the action vigorously through qualified counsel, and second, the representatives must not have antagonistic or conflicting interests with the unnamed members of the class." *Lerwill v. Inflight Mot. Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir.1978). *See also Walters v. Reno*, 145 F.3d 1032, 1046 (9th Cir.1998).

First, Respondents have not contested Perkins Coie's qualifications to vigorously prosecute the action. The Court finds that Perkins Coie is qualified. *See* Pet. Br., Ex. 2, Boeder Decl. Second, because both named and unnamed Petitioners have an identical claim, their interests are coextensive, not conflicting. Petitioners are adequate representatives of the class.

### G. Petitioners Can Maintain the Class Action Under Either 23(b)(1)(A) or 23(b)(2)

Petitioners have met the prerequisites of Rule 23(a). However, in order to maintain the class action they must demonstrate that they meet at least one subsection of 23(b). Fed.R.Civ.P. 23. Petitioners can maintain a class action pursuant to either 23(b)(1)(A) or 23(b)(2).

 Petitioners may maintain a class action under Rule 23(b)(1)(A) if they show that prosecution of individual actions would risk "inconsistent or varying adjudications with respect to individual members of that class" that could result in "incompatible standards of conduct for the party opposing the class." Fed.R.Civ.P. 23(b)(1)(A). "This danger exists in those situations in which the defendant by reason of the legal relations involved can not as a practical matter pursue two different courses of conduct." *La Mar v. H & B Novelty & Loan Co.*, 489 F.2d 461, 466 (9th Cir.1973).

Petitioners meet this subelement. Because interpretation of a single statute is at issue, if district courts rule opposite ways, Respondents face upholding diametrically opposing standards of conduct. INS would have to reconcile an interpretation that was both incorrect and correct at the same time. This is a problem due to the transfer of individuals between judicial districts. INS would face a complex legal and practical situation if it moved an individual from a district where removal was barred into one where it was allowed, as diametrically opposing rulings would make it difficult to determine whether the individual was removable. Given the danger of inconsistent results if the cases are allowed to proceed individually, Petitioners can maintain a class action pursuant to 23(b)(1)(A).

 Petitioners may also maintain a class action pursuant to 23(b)(2) if Respondents have acted on "grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2). "It is sufficient if class members complain of a pattern or practice that is generally applicable to the class as a whole. Even if some class members have not been injured by the challenged practice, a class may nevertheless be appropriate." *Walters*, 145 F.3d at 1047. *See also Soc'y for Individual Rights, Inc. v. Hampton*, 63 F.R.D. 399, 401 (N.D.Cal.1973) (uniform application of regulation made relief on class wide basis appropriate under 23(b)(2)), *aff'd*, 528 F.2d 905 (9th Cir.1975) (*per curiam*); Rule Advisory Committee Notes to Subdivision (b)(2).

It is undisputed that the INS has acted identically toward all class members. The INS has a stated intention to remove all individuals subject to an order of removal to Somalia, whether or not a government exists that is able to accept deportees. Thus, Petitioners challenge the same pattern or practice and face the same injury—illegal removal. Therefore, because Respondents behavior toward class members is uniform and all class members face the same potential injury, class wide relief is appropriate in this case and Petitioners can clearly maintain their action pursuant to 23(b)(2). IT IS

ORDERED that Petitioners class, as redefined by the Court, is certified.

### IV. Zadvydas Claims of the Individual Petitioners

▮▮▮ In *Zadvydas v. Davis*, 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001), the Supreme Court directed the district courts, in accordance with their authority under the federal habeas corpus statute, to ask whether the detention of a lawfully admitted alien exceeds a period reasonably necessary to secure removal. 533 U.S. at 699–700, 121 S.Ct. 2491. Under the statute authorizing detention pending removal, an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future. *Id.* After a presumptively reasonable period of six months, once a petitioner provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the government must respond with evidence sufficient to rebut that showing. *Id.*

As noted above, the history of the *Zadvydas* habeas claims of Petitioners Ali, Aweys, and Hundiye are quite similar. All three were ordered removed in 2001 and detained. Foster Decl. Exs. L, M, N. All three filed *Zadvydas* habeas petitions in this district. *Id.* The INS did not contest Mr. Ali's or Mr. Hundiye's petitions, and both were released from detention and their petitions were dismissed by stipulation. The INS litigated Mr. Aweys' *Zadvydas* claim, and this Court granted his habeas petition. These three Petitioners were re-detained by the INS in November 2002 in expectation of their imminent removal to Somalia, the government having arranged a flight to that country. There are no allegations that Petitioners violated the conditions of their release. The only fact that apparently changed was the INS' arrangement of a flight to Somalia.

Given this Court's holding that Petitioners' removal to Somalia would violate 8 U.S.C. § 1231(b), and with no evidence to suggest that conditions in Somalia are likely to change in the near future, the Court finds that there is no significant likelihood of Petitioners' removal in the reasonably foresee-able future. Indeed, Petitioners have already litigated this matter, and the Court finds no rational reason to require them to continue in detention waiting for another six months to run. While a violation of the conditions of release could justify a return to custody, *Zadvydas*, 533 U.S. at 701, 121 S.Ct. 2491, the fact that the Attorney General planned to remove Petitioners in violation of statute does not initiate another six month period of detention. The Court GRANTS Petitioners Ali, Aweys, and Hundiye's habeas petitions and ORDERS that they be released within two business days after entry of this order on conditions set by the INS, which may include those set forth in 8 C.F.R. § 241.5(a).

Mr. Mohamud, however, is differently situated than the other individual Petitioners. He has a prior-filed pending habeas petition in this District before the Honorable Barbara J. Rothstein. He has not withdrawn his habeas in pursing this class action. Because his earlier-filed petition has been fully briefed and is appropriately before Judge Rothstein, the Court will refrain from ruling on Mr. Mohamud's claims.

### CONCLUSION

The Court concludes that a permanent injunction and class action certification are necessary to protect the individuals and the rule of law they seek to enforce. The position of the Government that no acceptance is necessary before human beings can be dropped into a lawless state is contrary to the statute. The statute's construction, legislative history, compatibility with international treaties, and developing interpretation do not support the Government's position.

The use of a class action is necessary to litigate the common legal issues for a large number of Somalis. The class action vehicle is necessary to open the doors of the courthouse for a large number of Somalis whose identity and location the Government refuses to reveal. A permanent injunction shall issue on behalf of the class. The individual Petitioners Ali, Hundiye, and Aweys shall be released pursuant to this Court's order.

The Clerk is directed to send copies of this order to all counsel of record.